**HERCULES POWDER COMPANY,**
Appellant,

v.

**NATIONAL LABOR RELATIONS
BOARD, Appellee.**

No. 18401.

United States Court of Appeals
Fifth Circuit.

Nov. 17, 1961.

M. L. Taliaferro, C. V. Stelzenmuller, Birmingham, Ala., William V. Roth, Jr., Wilmington, Del., Moore, Thomas, Taliaferro, Forman & Burr, Birmingham, Ala., of counsel, for petitioner.

Melvin J. Welles, Atty., N. L. R. B., Marcel Mallet-Prevost, Asst. Gen. Counsel, N. L. R. B., Dominick L. Manoli, Assoc. Gen. Counsel, Washington, D. C., Stuart Rothman, General Counsel, Allan I. Mendelsohn, Attorney, National Labor Relations Board, Washington, D. C., for respondent.

Before CAMERON and WISDOM, Circuit Judges, and THOMAS, District Judge.

WISDOM, Circuit Judge.

The Hercules Powder Company petitions this Court to review and set aside an order of the National Labor Relations Board, issued April 22, 1960, under Section 10 of the National Labor Relations Act, as amended (61 Stat. 136, 73 Stat. 519, 29 U.S.C.A. § 160). In its answer, the Board requests enforcement of the order. We hold that the Board had no jurisdiction and set aside the order. N. L. R. B. v. Happ Bros. Co., 5 Cir., 1952, 196 F.2d 195 controls this case: the Board has no jurisdiction to entertain a complaint charging that an employer engaged in unfair labor practices when the processes of the Board are invoked and set in motion by a charging party as a front for a union which failed to file non-communist affidavits and reports as required by the Taft-Hartley Act.

I.

Hercules, a Delaware corporation, operates a dynamite plant in Bessemer, Alabama. District 50, United Mine Workers, Powder and Acid Workers' Local No. 134933, has been the collective bargaining representative in the plant since 1950. The Union never complied with Sections 9(f), (g), and (h) of the

Taft-Hartley Act requiring the filing of noncommunist affidavits and reports.

The Union has had five successive two year contracts with Hercules including the contract of 1958. Each contract provided that if operations are discontinued for any cause, a sufficient time, not to exceed 72 hours, would be allowed during which all the nitroglycerine would be processed into finished powder and all operating buildings would be properly cleaned.

April 4, 1958, the Union served a sixty-day notice of intent to terminate the contract. The parties began bargaining negotiations and by June had made progress toward agreement. After a number of meetings, the Union accused Hercules of preparing to lock out the employees; Hercules accused the Union of planning a quickie strike. The only unresolved issue on the last day of the contract, June 4, 1958, was the seniority clause, and at the meeting that day the negotiators agreed to meet again to discuss this issue. Hollyfield, the Union representative refused to agree unconditionally to give seventy-two hours notice before going out on strike; he would agree to the extension of the sixty-day notice for any period deemed necessary, upon condition that any benefits negotiated be retroactive to June 4, 1958. The Company insisted on the seventy-two hours notice by the Union in the event of a strike or by the Company in the event of a lockout. Hollyfield refused. The Hercules representative then handed Hollyfield a letter giving notice that the plant would be closed down at 12:01 A.M., June 5, "since explosives production and shipment might become seriously hazardous in the event of sudden work stoppage and since the Company is obligated to its customers to maintain certain delivery schedules". Hercules placed notices on the bulletin board on June 4 and in the employees' pay envelopes on June 5 telling the employees not to report for work "inasmuch as it is impossible to operate the plant without a guarantee that a sufficient cleanup period would be observed".

The Company's unyielding attitude was short-lived. June 5 Hercules acceded to the Union's demand and reached final agreement on the terms of a new contract before the alleged lockout began. Hercules would not allow the men to return to work, however, until the contract was prepared and signed. The contract was ratified June 11, signed June 12, and operations resumed June 13.

November 28, 1958, T. Z. Parsons, President of the Local, for himself and 109 members, filed charges with the Board at its Regional Office in Atlanta alleging that Hercules had engaged in unfair labor practices. The same day, the Atlanta office mailed letters to Parsons and the 109 employees requesting them "to report" at the Birmingham office December 1 and 2, 1958. Parsons and 100 of these employees showed up. Prepared by the Board and ready for signature was an abbreviated, generalized version of Parsons' original charges. All who reported signed. At this time, and prompted by the Birmingham Board agent, Parsons withdrew his original charges. Leaving no loose ends, Parsons signed for the nine employees who failed "to report." The Board accepted charges from these nine along with the others, treating each employee's charge as a separate case for filing purposes but consolidating the 110 cases, thereafter treating them as one case. In due time the Board issued a complaint against Hercules.

By a bare majority, two members dissenting,[1] the Board held that Hercules

---

1. Chairman Leedom, dissenting, said: "I would dismiss the complaint herein in view of what I deem to be the Union's refusal to renew unconditionally the 72-hour strike notice provision, and in view of the special danger of damage to the Respondent's physical plant in case of a 'quickie' strike. I believe that these circumstances bring the case within the rule enunciated in Betts Cadillac Oldsmobile, 96 NLRB 268, that an employer may lock out his employees in the face of a threat

violated Section 8(a) (1) and (3) of the Act by curtailing production and locking out its employees while active bargaining negotiations were still in progress with the Union.[2] 127 N.L.R.B. No. 46. We do not reach the merits of the case, since the Happ decision compels us to hold that the Board had no jurisdiction. The Trial Examiner discussed the jurisdictional issue in his Intermediate Report [3] approved in full by the Board. The Board opinion is silent on this issue.

## II.

■ Section 9(h) of the Taft-Hartley Act, 29 U.S.C.A. § 159(h), as it existed before the recent amendments, provided that:

"No investigation shall be made by the Board * * *, and no com-

plaint shall be issued pursuant to a charge made by a labor organization under subsection (b) of section 160 of this title, unless there is on file with the Board an affidavit executed * * * by each officer of such labor organization and the officers of any national or international labor organization of which it is an affiliate or constituent unit that he is not a member of the Communist Party * * *."

This provision is jurisdictional. N. L. R. B. v. Coca-Cola Bottling Co. of Louisville, 1956, 350 U.S. 264, 76 S.Ct. 383, 100 L.Ed. 285. Its repeal, therefore, by the Labor Management Reform Act of 1959, § 201(d), did not retroactively confer jurisdiction on the Board in pending

of a strike, if such lockout is necessary to prevent, inter alia, damage to his physical plant."

Rogers, member, dissenting, said: "In the light of the Union's withdrawal of the 72-hour notice provision, and in view of the dangerous nature of the operations involved, I would find that the Respondent acted reasonably, since it did not wish to, nor was it compelled to, accede to the Union's demands, to avoid the possible disaster of a sudden shutdown of its plant by the Union. * * * Here not only would the Respondent's business have suffered from a strike without notice, but both its plant and the nearby community at large were threatened with a possible disaster if such a strike occurred."

2. The Board held: "[T]he Respondent's conduct in issue did not result from any real threat of a 'quickie' strike by the Union. The repeated verbal assurances by the Union that no strike was contemplated, its offers to extend in writing the 72-hour strike notice provisions of the 1956 contract, the issuance of layoff notices by Respondent at a time when the parties were close to an amicable settlement of their differences, the shutdown after agreement was reached and the refusal to reopen the plant in the circumstances outlined above, and the past bargaining history between the parties, including the responsible regard for the safety of the plant displayed by the same Union negotiator in 1954, all serve to underscore this fact. * * * If Respondent resorted to the lockout merely

to avoid the possibility of a strike and its attendant disruptions, its action cannot be justified under the law. Such anticipatory conduct is not sanctioned by the Act and layoffs so motivated violate the Act."

3. The Trial Examiner ruled: "Respondent, in its brief, admits that 'no investigation was made of [the] charge' filed by Parsons in Case No. 10–CA–3803, and it is undisputed that no complaint proceedings were ever instituted pursuant to that charge. The complaint before me is based on the 110 charges filed by the individual employees in Case Nos. 10–CA–3809 to 10–CA–3918 inclusive. The fact distinguishes this case from N. L. R. B. v. Happ Brothers, 196 F.2d 195 (C.A. 5), and N. L. R. B. v. Alside, Inc., 192 F. 2d 678 (C.A. 6), upon which Respondent relies. The distinction was recognized by the Board in Bolden Rod Broilers, 122 NLRB No. 135, where the Board in its analysis of Happ Brothers and Alside noted that 'the charges in those cases were filed by officers of the non-complying union on behalf of a number of employees other than the charging parties themselves. The charges filed in this case, however, involved only the individual complainants. See N. L. R. B. v. Augusta Chemical Co., 187 F.2d 63 (C.A. 5).' And the Board and the Courts have consistently held that individual employees may assert their rights before the Board without regard to the filing requirements imposed upon their labor organization by the Act."

cases initiated by non-complying unions.[4]

▆▆▆ The "Board's jurisdiction will not be presumed but must be made to appear". N. L. R. B. v. Ingram, 5 Cir., 1960, 273 F.2d 670, 672. Within the context of this case that principle requires an affirmative showing that the charging party was not a front for the Union.

In N. L. R. B. v. Happ Brothers, 5 Cir., 1952, 196 F.2d 195, this Court discussed the jurisdictional requirements at some length and on facts closely analogous to the facts here held that the requirement could not be evaded by a non-complying union using an individual as a false front. In Happ, as in the instant case, the president of the union filed charges as an "individual" and attached a list of employees similarly situated. Judge Borah, for the Court, held:

"[T]he jurisdictional requirements of the Act may not be defeated by the obvious subterfuge of having the president of the union designate herself 'an individual' instead of 'president.' * * * It must also be conceded that the Congressional purpose in enacting these provisions was to further its policy of wholly eradicating and barring from leadership in the American labor movement, at each and every level, adherents to the Communist party and believers in the unconstitutional overthrow of our Government. * * Surely this great purpose may not be rendered nugatory and destroyed by

subterfuge or resorting to the simple expedient of employing an individual to 'front' for non-complying unions. No less important than this is the regard which the law has for the promotion and protection of the rights of individual employees. N. L. R. B. v. Augusta Chemical Company, 5 Cir., 187 F.2d 63." 196 F.2d 196, 197.

On the facts, the Court distinguished Southern Furniture Mfg. Co. v. N. L. R. B., 5 Cir., 1952, 194 F.2d 59 and the per curiam decision in N. L. R. B. v. Augusta Chemical Co., 5 Cir., 1951, 187 F.2d 63. Happ relies on N. L. R. B. v. Alside, Inc., 6 Cir., 192 F.2d 678. In Alside the court held:

"Considering the question as a whole, it stretches credulity to the breaking point to believe that Worley did not on October 20, 1948, file the charges as a representative of the Union, when, before, after and even on that day, he was its chief, active protagonist. His signature, followed by the descriptive words, 'an individual,' does not destroy the evidential facts, most of which Worley himself admits. Our conclusion is that when Worley filed the charges he was acting as a 'front' or 'agency' of the Union." 192 F.2d 678, 680.

▆▆▆ The critical elements in Alside and Happ were these: the president of the non-complying union filed the charges allegedly as an "individual"; he attached

---

**4.** Congressman Griffin, a joint sponsor of the new law, in the Congressional Record of September 10, 1959 (A. 7915) said:

"However, the repeal of these sections does not have a retroactive effect and is not intended to excuse any previous failure to comply therewith."

See also Robins, Union Reporting Requirements Under Title II, in Symposium on the Labor Management Reporting and Disclosure Act of 1959 (Ed. Slovenko) 381, 390. The repeal of old sections 9 (f), (g), and (h), 29 U.S.C.A. § 159(f), (g), and (h) indicates new change in public policy. Senate Report No. 187, April 14, 1959, to accompany S. 1555, 2 U.S.Code Cong. & Administrative News,

86 Cong., 1st Sess., 1959, pp. 2318, 2351 states: "The Committee bill takes a new and more effective approach to the problem of preventing Communist infiltration of labor unions or the business community." Under the new law it is a criminal offense for any member of the Communist Party to hold a union office during such membership or for five years thereafter. Labor Reform Law of 1959, § 504, 29 U.S.C.A. § 504. It also requires detailed reports from unions under penalty of criminal punishment (Ibid., §§ 201–210, 29 U.S.C.A. §§ 431–440) rather than the mild sanctions of the LMRA.

to the charge a list of employees similarly situated; the charges were not limited to his individual grievances; the charges were exactly the same as they would have been if they had been made by the union and signed by its president. These elements are present here. But there is another, a decisive element here. This case resulted directly from action of the Union as a union. By a vote of the members, the Union "instructed" its president to file the charges which later (with one conspicuous omission) were the foundation for the complaint. The withdrawal of the original charges filed by the Union president for himself and 109 union members and the substitution of substantially the same charges in an abridged, consolidated version by the 110 members included in the original charge, accomplished only through the Board's taking action as a result of the first filing, do not make this case so different from Happ and Alside as to affect the result. A consolidated front made up of 110 identical parts may be just as false as one front.

A closer review of the record supports this conclusion.

### III.

This is not a case of Parsons' coming to the Board's Regional Office for help and asking what should be done about employees believing themselves to have been unlawfully locked out. This is not a case of aggrieved employees individual-ly appealing to the Board for help in asserting their rights. From the beginning, the charge against the Company was strictly Union business. There is no evidence in the record that any employees, as individuals, felt aggrieved. E. E. Hollyfield, Regional Director, District 50, United Mine Workers of America, and the principal Union negotiator, originated the idea and prepared the charge. He testified: "[A]fter months of prodding—after they [?] had asked me how to go about filing a charge—the employees had—and I told them; they finally insisted that I prepare a charge for them, and it was prepared in my office." He was asked: "Did all of the 110 employees come and visit you?" He answered: "No, sir; I saw none of the 110 employees, even after they filed this charge, or before, after I prepared that for them." Then he was asked: "Now, who was it that came to you about this matter, then, that you refer to?" He replied: "Well, Mr. Parsons spoke to me about it. They even brought it up at a Local Union meeting several months back, and I told them, it would be a matter of purely, personally filing charges.[5] After some months, then, they said they didn't know how to go about it, and wanted to know if I would help them to prepare the charges."

In spite of Hollyfield's warning or perhaps because of the difficulty of disguising the action of an organization as the action of individuals, the Union, as a

---

**5.** Hollyfield's warning of the necessity for individual action is on a par with the warning issued in Truck Drivers & Helpers Local Union No. 728 v. N. L. R. B., 5 Cir., 1959, 265 F.2d 439, cert. denied, 361 U.S. 917, 80 S.Ct. 261, 4 L.Ed.2d 186, a secondary boycott case. There, the issue was whether a boycott was induced by union action or by individual action. As in this case, at a union meeting one of the knowledgeable officers cautioned the members to exercise their rights as individuals only. This Court looked behind the false front. We said:

"[T]he distinction between individual action and collective action was not just fuzzy and confused; there was a deliberate attempt to produce collective union action by the Union acting as a

union but termed, for the purpose of subterfuge, individual action. The meeting was called by the Union's Secretary, conducted by union officers, and the members voted as members of the union."

See also United States v. International Union, United Mine Workers, D.C.D.C. 1948, 77 F.Supp. 563, 566, affirmed D.C. Cir., 1949, 85 U.S.App.D.C. 149, 177 F. 2d 29, cert. denied 338 U.S. 871, 70 S. Ct. 140, 94 L.Ed. 535; United States v. Brotherhood of Railroad Trainmen, N.D. Ill., 1951, 96 F.Supp. 428, 431; Woodworkers Union, 116 N.L.R.B. 507, enforced, N. L. R. B. v. International Woodworkers of America, 5 Cir., 1957, 243 F.2d 745; Electrical Workers, 82 N.L.R.B. 694 (1949).

union, voted to invoke the Board's processes and "instructed" its president to file charges against Hercules. Parsons, the charging party, had been president of the local for nine years and represented the Union at the bargaining table. His testimony is revealing:

"Q. Would you tell us about the execution of this document, [the charge] please, sir? (Respondent's Exhibit No. 1 handed to witness.) A. Yes, sir; I really got my arm twisted on this. I got my ear beat down quite a beat; pushed by the complete membership to do something about it.

"Q. Where were you pushed; at the meetings, or where? A. At meetings.

"Q. Did they take a vote at the meeting, to file the charges? A. Yes, sir.

"Q. Did they instruct you to have it done? A. They instructed me to file these charges, and get them to moving—to Moody. [Field Representative of District 50]

"Q. Tell me, how you went about having that document signed. A. I called a special union meeting.

"Q. And it was signed at that meeting? A. Most of them; some of the fellows, I failed to get, because of their work schedule. They couldn't make the meeting, and I went to their homes."

Parsons did not solicit or obtain the signature of any non-union member of the bargaining unit, and no non-union employee filed charges.

November 28, 1958, Parsons filed with the Atlanta Regional Office the charges Hollyfield had prepared. The filing started the Board moving at a fast clip that would have been commendable, if the charges had not been patently suspect. As the "Basis of the Charge" Parsons alleged:

"Hercules Powder Company during negotiations threatened to shut down its Bessemer Plant and did on June 4, 1958, shut said plant down, even though assurances were given by employees that no strike vote had been taken and none was anticipated, so long as Company bargained in good faith. That if at a later date employees deemed it necessary to resort to strike action, the management of the Company would be given seventy-two (72) hours notice that a strike would ensue, as had been done in the past after employees had voted to use economic strength.

"Employer had no reasonable grounds to believe a sudden strike would be called. No reasonable ground of fear that employees would fail to complete into finished product explosives being manufactured.

"Employer attempted, by letter to each employee, May 23, 1958, to negotiate individually even though negotiations were in progress and an existing wage agreement had two (2) weeks to run before expiration.

"These and other coercive actions by employer were made, in an effort to force upon employees contract terms desired by employer but detrimental to seniority, financial and other rights of employees.

"These and other acts of employer, through its agents, deprived employees of rights guaranteed to them under the Act."

These charges, unlike the revised charges, make it plain that the controversy was between the Company and Union over the Company's threat to use economic pressure to obtain a favorable collective bargaining contract. The grievance was the Union's grievance. Any doubt as to the Union being the real party at interest is dispelled by the reference to Section 8(a) (5) making it an unfair labor practice for an employer to refuse to bargain collectively with the representatives of his employees.

Parsons charged that the employer engaged in unfair labor practices within the meaning of Section 8(a), subsections (1), (3), and (5). He made no reference to his office as president of the Union;

instead, the word "individual" appears under his signature, and in the block of the form for the "Basis of the Charge" he alleged: "This charge, as herein filed, is in my own behalf and those employees [109] who have designated me to act for them, as shown on their petition hereto attached." [6] The Company employs 136 workers.

The Board treated the filing as one case and assigned it the number, Case No. 10–CA–3803. That same day the Board's Regional Office in Atlanta wrote Hercules inquiring as to its position and informing the Company that the matter had been assigned to a supervising attorney for investigation. Again that day the Board decided that all of the named employees "should be contacted by letter for the purpose of securing their individual charges." [7] Before November 28, a Friday, was over, the Regional Office had mailed the necessary 110 letters to Parsons and the 109 union members he represented, requesting them "to report" at the Birmingham office "December 1 and 2" with reference to the charges, had mimeographed several hundred forms each with same charge and sent them to Birmingham, and had been in touch with Parsons to see if he could help expedite processing the revised charges.

According to the Board, the letters were written solely because of a policy of requiring separate charges to be filed by each individual except when a labor organization is the charging party.[8] The Board asserts that it learned Parsons was president of the Local 134933 only after the letters were mailed. According to Hercules, the Board had no such policy and, if it did, the policy was contrary to the law and to previous practices of the Board.[9] Hercules draws the inference that the Board mailed the letters because it found out that Parsons was the president of the local and the charges he filed were a blatant effort to front for a noncomplying union. The general counsel candidly conceded, in his response to Hercules' motion to dismiss, that. *"Because of the 'fronting' problem thus presented* with respect to the Section 8(a) (5) allegation in the charge filed in Case No. 10–CA–3803", "a withdrawal of that charge was solicited and secured". Whatever its reasons for writing the letters, the Board discovered that Parsons was president of a non-complying union *before* the Board substituted its revised charges and, in revising the charges, the Board was sufficiently aware of the "fronting problem" to drop the Section 8(a) (5) allegation altogether.

Monday, December 1, 1958, the Board's Birmingham office stayed open until seven at night to enable Parsons and the 109 other employees to sign the Board's version. Not all showed up. Parsons signed for nine of the absentees as "an individual as attorney-in-fact". The only authorization he had for these nine was the original written authorization attached to and specifically referring to the charges filed in 10–CA–3803. The Board accepted these nine charges, assigned each a case number, and treated each identically as the 100 other cases, in spite

6. The "petition" states: "We, the undersigned, authorize T. Z. Parsons, Adger, Alabama to prosecute, in our behalf, an Unfair Labor Practices Charge against Hercules Powder Company, P. O. Box 190, Bessemer, Alabama, occasioned by the Company locking us out of our jobs on June 4, 1958, as shown on attached charge filed by said T. Z. Parsons."

7. Quoted from The General Counsel's response to respondent's motion to dismiss.

8. After the Happ and Alside decisions, the Board issued Bulletin No. 291, October 27, 1952, stating: "In the future, in all cases in which charges are being filed by individuals involving the same union or employer, each individual should file his own charge."

9. The Trial Examiner said at the hearing: "I don't know whether that is the policy of the Board or not. It certainly is not required by the Act." He found, however, that it was an office policy and Board policy. The Board's counsel said that "any person can file a charge on behalf of any other person." See NLRB Rules and Regulations, 29 CFR § 101.2. Southern Furniture Mfg. Co. v. N. L. R. B., 5 Cir., 1952, 194 F.2d 59 so holds

of its alleged policy against accepting such charges. At the hearing, in order to establish a basis for Parsons' filing these nine charges, the Board's counsel was forced to go back to 10–CA–3803 to find authorization. Thus, both Parsons and the Board regarded the original written authorization to file 10–CA–3803 (that came through union action at a meeting) as a continuing and effective authority for Parsons to sign the nine new charges and for the Board to take jurisdiction.

On the facts, the instant case, which is stronger than Happ, would be squarely within the Happ holding if the Board had not revised the first charges. We think that the individual filings and the revision of the charge did not alter the basic fact that the Union was the real party at interest.

Accepting the Board's view as to the November 28 letters, these were not sent out with any idea of changing the character of the charge, but for "the sole purpose" of having each employee sign rather than an intermediary sign for the employees. The Board prepared a blanket charge and filled in the significant blocks in the form before discussing the matter with any employee, except Parsons. This in itself suggests that there was no intention to change the substance of the charge. Although each revised charge was assigned a case number, the cases were consolidated and treated as one proceeding. The congressional mandate against fronting for a non-complying union would be completely ineffective if, after the Board learns that the charging party is the president of a non-complying union and the Board is aware of a "fronting problem", the Board and the Union would be able to get around the mandate by three coordinated expedients: (1) persuading the president to withdraw his patently fronting charge; (2) redrafting the charge in terms of palatable generalities; and (3) accepting the redrafted charges by the same union members the president purported to represent in the first place.

The Board's revised charge is short and simple:

"The Employer, in order to discourage membership in a labor organization, discriminated in regard to the hire and tenure of employment and to the terms and conditions of employment of the following named employee on or about June 4, 1958 and thereafter: Mr. James W. Abernathy.

"By these and other acts and conduct the employer interfered with, restrained and coerced its employees in the exercise of their rights as guaranteed in Section 7 of the Act."

This version is cast in the general terms of Section 8(a) (1) and 8(a) (3) without any more indication of individual grievances than Parsons' longer version. There is no doubt that workers may have individual grievances coincidental with their union's grievances. But when we consider the background that led to the new filings and when we consider the record as a whole, including the testimony bearing on the merits, it seems to us that the Union was the only party at interest. There was never any question as to Company discrimination against certain individuals or against the 110 employees as union members. The question was whether a company is free to bring economic pressure against a union by threatening a lockout, or by employing a lockout, in order to force the union to agree to a proposed collective bargaining agreement. This is a question of great importance to unions. It was the basis for the Union's decision to file the charges in this proceeding.

## IV.

We summarize.

A. *From the beginning, the moving party and the real party at interest was the Union.* The charges stemmed not from individual grievances by some employees, but from the Union's grievance. The charge was filed as a direct result of the Union's official action in instructing its president to file charges against

the Company on behalf of the members. The action was not haphazard, but came after discussion at several meetings, presided over by Parsons, and the final decision was made at a formal meeting by persons voting, and having a right to vote, only as union members.

■■ B. *There is no difference in effect between the first charge filed by Parsons for himself and for 109 union members and the second charge filed by Parsons and 109 others.* The omission of any reference to Section 8(a) (5) and the substitution of the Board's generalized version for Parsons' fairly plain statement tend to obscure the issue, but they cannot convert union action into individual action. Nor can a hundred union members convert union action into individual action by signing charges themselves rather than authorizing some one else to sign for them; as pointed out, in nine instances the Board recognized that Parsons' original authority to file was effective for his later filing. There was nothing wrong in the first place in having Parsons sign for others. Regardless of Board policy, any person, even a stranger, may file charges on behalf of one or more employees. Southern Furniture Mfg. Co. v. N. L. R. B., 5 Cir., 1952, 194 F.2d 59.

■ C. *Parsons' original filing invoked the Board's processes and thereafter the processes never stopped until a complaint was filed and heard and an order issued.* The only justification for the Board's writing letters to the 110 employees and processing the resulting revised charges was Parsons' first charge. Thus, the Trial Examiner stated: "Having been informed *through a legal charge* that 110 employees claimed that they were discriminatorily discharged * * * Board personnel would have been derelict in the performance of their duty had they not pursued the matter in the manner in which it was pursued." But the Board cannot have its cake and eat it too. The Board cannot assert jurisdiction, because Parsons filed a "legal charge", and at the same time assert that Parsons' filing should be disregarded because it was withdrawn. If it be considered a nullity, the Board had no authority to engage in activities amounting to a solicitation that resulted in the Board's filing a complaint. "The Board cannot use its own initiative in respect to charging unfair [labor] practices." N. L. R. B. v. Hopwood Retinning Co., 2 Cir., 1938, 98 F.2d 97, 101. This Court recently observed:

"Section 10(b) of the Act requires that unfair labor practices in a complaint must be supported by a charge [Footnote by the Court]: As introduced in the Senate, the Wagner Bill (S. No. 1958, 74th Cong. 1st Sess.) gave the Board the power to institute proceedings whenever it had reason to believe that an unfair labor practice existed. As finally adopted however Section 10(b) limits the Board to prosecutions of violations brought to its attention by aggrieved parties. Judge Friendly has pointed out that this 'provision contrasts not only with the Federal Trade Commission Act but with other Federal regulatory laws.' Building Material Teamsters, Local 282, etc. v. N. L. R. B., 2 Cir., 1959, 275 F.2d 909, 913," N.L. R.B. v. Local Union No. 450, Operating Engineers, 5 Cir., 1960, 281 F.2d 313, 317.

In short, the proceeding before us is the same proceeding the Union voted to bring. The law which in 1958 denied the Board's processes to non-complying unions cannot be subverted by dividing a fronting charge into 110 so-called "individual" charges, when the real party at interest is the non-complying Union.

The order of the Board is vacated and set aside.