**NATIONAL LABOR RELATIONS BOARD, Petitioner,**

v.

**LOCAL NO. 2 OF the UNITED ASSOCIATION OF JOURNEYMEN AND APPRENTICES OF the PLUMBING AND PIPEFITTING INDUSTRY OF the UNITED STATES AND CANADA, AFL–CIO, Respondent.**

**Nos. 229–231, Dockets 29985–29987.**

United States Court of Appeals
Second Circuit.

Argued Jan. 24, 1966.

Decided May 12, 1966.

Friendly, Circuit Judge, dissented in part.

George B. Driesen, Washington, D. C., (Arnold Ordman, Gen. Counsel, Dominick L. Manoli, Associate Gen. Counsel, Marcel Mallet-Prevost, Asst. Gen. Counsel, and Warren M. Davison, Atty., N.L.R.B., Washington, D. C., of counsel), for petitioner, National Labor Relations Board.

Walter M. Colleran, Mineola, N. Y. (Doran, Colleran, O'Hara & Harding, Mineola, N. Y., of counsel), for respondent, Local Union No. 2.

Maria L. Marcus, New York City (Robert L. Carter, and Joan Franklin, New York City, of counsel), for Urban League of Greater New York, Inc., a charging party petitioner for intervention, and for National Ass'n for Advancement of Colored People, amicus curiae.

Martin F. O'Donoghue, Patrick C. O'Donoghue, Martin F. O'Donoghue, Jr.,

Washington, D. C. (O'Donoghue & O'Donoghue, Washington, D. C., of counsel), and Harold Stern, New York City, for United Ass'n of Journeymen and Apprentices of Plumbing and Pipefitting Industry of United States and Canada, AFL–CIO, amicus curiae.

Before FRIENDLY and HAYS, Circuit Judges, and DOOLING, District Judge.*

DOOLING, District Judge:

The Labor Board seeks enforcement of its order based on findings that the respondent Local Union No. 2, United Association of Journeymen Plumbers, caused Astrove Plumbing & Heating Corp. ("Astrove") to discriminate against four non-union men in regard to hire and tenure of employment [National Labor Relations Act, § 8(b) (2), 29 U.S. C.A. § 158(b) (2)], and that the respondent restrained and coerced the same four men in the exercise of their rights under Section 7 of the Act [NLRA § 8(b) (1) (A), 29 U.S.C.A. § 158(b) (1) (A)].

The New York City Association of Contracting Plumbers, of which Astrove was a member, had a collective bargaining agreement with the respondent, Local Union No. 2. The bargaining agreement contained a priority-of-employment provision which read:

### ARTICLE 2

#### UNION SECURITY

(a) The Association agrees that its members will give priority in employment opportunity to qualified and competent men based upon their length of employment in the geographical areas of the Union as contrasted and compared with men who have worked mainly in other geographical areas. The previous hiring practices in all respects shall continue including practice as to qualifications and competency, and furthermore, members of the Union may be hired as in the past without regard to prior length of service.

(b) In the event that during the term of this Agreement there is a change in the law which will permit a greater degree of Union security to the Union, such Union security provided in (a) above, shall be modified so as to provide the maximum degree of Union security permitted by such change in the law.

Astrove had a contract with the City of New York to install the plumbing and heating equipment in the Bronx Terminal Market; work had started in October 1963. Astrove employed as many as fifty journeymen and apprentice plumbers on the job. It had laid nine or eleven journeymen and apprentices off the job on April 9, 1964, because they were unaccustomed to the difficult work then in hand.

On April 23, 1964, the New York City Commission on Human Rights, charged with enforcement of an anti-discrimination provision of local law applying to work on City contracts (Administrative Code, § 343–8.0), referred Gerry Gonzalez, Bernard Allman, Isaac Borges and Jose Rodriguez, none of whom was a union member, to Astrove for employment. Astrove interviewed the men, got the names of their former employers, and wrote for information about the men's qualifications. Before Astrove had received answers to all its inquiries, the Commission on Human Rights advised Astrove that the four men were qualified journeymen plumbers and indicated to Astrove that its City contract might be cancelled unless its hiring practices were modified. Astrove thereupon on April 29 advised Local 2 that the four men would be hired. Local 2 at once dispatched a letter to the Joint Industry Board protesting the threatened hiring as violative of the priority-of-employment provision in the collective bargaining agreement, and it requested an arbitration hearing.

On April 30 Gonzalez, Rodriguez, Allman and Borges reported for work to Astrove's foreman at the Bronx Terminal

---

* Eastern District of New York, sitting by designation.

Market job. Gonzalez and Rodriguez were told to change into work clothes, went to the change shanty to do so and, as they were changing, the business agent of Local 2 called the plumbers out on strike on the stated ground of an unsanitary work condition that had been under discussion for some weeks. Allman and Borges arrived a little later and were told by Astrove's foreman that there would be no work that day. The sanitation controversy was settled a few minutes after ten on the morning the strike was called, but the plumbers did not return to the job, no work was done that day, and the four men were not hired and were not paid.

While there was in fact a pending controversy over sanitary conditions, the members of Local 2 in the change shanty knew that Gonzalez, Rodriguez, Allman and Borges were not union men, one of the plumbers characterized the ascription of the walkout to the unsanitary condition as "baloney," and, later in the morning, the Local 2 business agent told Gonzalez that if he was hired by Astrove for the project "we are going to strike this project."

On the following morning, May 1, the four men again reported to the Astrove foreman and were told to go to the change shanty. Rodriguez, Allman and Borges went into the shanty, and there the Local 2 job steward asked them for their union welfare numbers and, when they could not furnish such numbers, told them, "We are not going to work with you here today, because nobody without a number can work in here." The three left the shanty and, with Gonzalez, went back to the Astrove foreman to fill out W–2 forms. Then all four started with the other plumbers toward the job site. One of the plumbers, in the presence of the Local 2 job steward, stopped them, and asked them if they had union membership books. They answered, "No." The job steward then called out to other men to come back, saying, "We don't work with non-union people." Others took up the cry, and all walked out. The Astrove foreman told Gonzalez and the

other three that he could not do the work with only the four men; they were not hired or paid, and no work was done that day.

For two weeks, Astrove's work on the project was stopped. Astrove requested Local 2 to supply men for the job, and the President of Local 2 refused to do so until the pending arbitration had been heard and decided. Gonzalez and the other three men reported for work each morning, and they remained until Astrove's foreman advised them through the representative of the Human Rights Commission that there would be no work.

The strike became a *cause celebre*. Local 2 protested that it had taken specific affirmative action to open its ranks to members of minority groups and that it was not discriminating against Puerto Ricans or Negroes, but was simply insisting on Astrove's compliance with the priority-of-employment provision under which, Local 2 claimed, some 200 unemployed members of the local were entitled to preference over the four men of undetermined qualifications referred to Astrove by the Human Rights Commission. The President of the AFL-CIO, who was a member of Local 2, was quoted as saying he would resign from the Local if any member of it worked with a non-union man, and as saying, "This union does not work with non-union men." The president of the Local testified that he "wholeheartedly" agreed with the sentiment. It was based on the theory that each union man, acting as an individual, was morally bound to govern himself in accordance with Section 40(K) of the Local's Constitution and By-Laws, which provided

"No member may work for any employer who has in his employ any journeyman or apprentice who is not a member of the United Association."

Toward the end of the second week of the strike the Mayor intervened, and an arrangement was made under which work was to be resumed and the four men were to take a qualifying examination under union supervision but, in effect, under

public view and with an opportunity afforded third parties to review the examination papers. Astrove resumed work on May 18 but the four men were not hired on, presumably because of the pending qualifying examination. Three of the four men took the test on May 18 and failed it. The president of Local 2 said, "I couldn't for the life of me see how those men could concentrate." The room was "jammed." "The cameras were all around the place." Although the test was fair in itself, it was one that presupposed a program of preparatory study, since it required command of a good deal of technical data that not every qualified plumber keeps at his fingertips. A later effort to arrange a test failed when Local 2 declined to admit an observer and to allow the examination papers to be checked.

On May 8 and 11, 1964, unfair labor practice charges were filed by Jose Rodriguez, The Urban League of Greater New York, Inc., and The National Association for Puerto Rican Affairs; Isaac Borges and Bernard Allman did not file charges but they were witnesses and appeared at the hearing through counsel associated with the National Association for the Advancement of Colored People.

The conclusion of the Hearing Examiner, adopted by the Board, was that Local 2 struck Astrove on April 30 because of the threatened hiring of the four non-union men and not because of the sanitary condition grievance, and struck Astrove from April 30 to May 18 to prevent it from going through with the hiring of the four men, and did so because the four were not union men, and not because they did not qualify for hire under the priority-of-employment provision of the collective bargaining agreement.

■ Respondent argues that when Astrove and the President of Local 2 first discussed the threatened hiring the union objection centered on the questioned competency and qualification of the four men. The Hearing Examiner, on substantial evidence, found otherwise; but even were respondent so far correct, the evidence is that the strike itself was called and continued as a strike against the hiring of non-union men.

■ Respondent argues that the April 30 walkout was genuinely based on the sanitation grievance. The Hearing Examiner's contrary conclusion rested on substantial evidence: the leisurely course of the earlier stages in processing the sanitation grievance, the fact that the general contractor, not Astrove, was required to remedy the condition, the calling of the strike two hours before the holding of a meeting already scheduled to discuss the grievance, the few minutes it took at the scheduled meeting to adjust the grievance, the very use of a full-scale strike rather than an on-premises work stoppage for such a grievance, the fact that no other craft affected by the grievance went out on strike, and the evidence that the Local 2 members were aware that four non-union men were reporting for work that morning—these matters and others supported the Hearing Examiner's conclusion.

Finally, Respondent's contention that Local 2 did not again on May 1st call and then continue the strike until May 18 in order to prevent Astrove from hiring the four non-union men is met by the contrary finding of the Hearing Examiner, again supported by substantial evidence: the men walked out in concert on May 1 because Astrove had hired four non-union men; the job steward observed their action; Local 2 adopted the walkout, while seeking to interpret it as reflecting the striker's individual choices not to work with non-union men, by refusing to supply substitute plumbers when requested, by treating the walkout in its press releases as justified by Astrove's hiring the four men in alleged violation of the priority of employment clause, and by approving the strike as a demonstration of the Local 2 membership's adherence to the principle of Section 40(K) of the Local Constitution that Local 2 members did not work—and for fifty years had not worked—with non-union men.

■■ The evidence warranted rejection of the Union's contention that the

strike was called or continued because Astrove's hiring of the four men violated the priority-of-employment provision. The qualification and competency of the four men and their length of employment in the area were not known at the time of hiring and no effort was made to determine the facts before taking strike action. The Human Rights Commission had presented the four men as competent and qualified. At no time, even during the hearing, were their qualifications and competency directly challenged. Local 2 took no ordered action that could be interpreted as presenting for the jobs four men preferentially qualified by length of local employment who were competent to do the work. The conjecture that Local 2 might, by diligence of inquiry at the time, have shown that the four had no local employment history or were not competent is of no avail now. As the Hearing Examiner noted (J.A. 173), whatever the relevancy of that matter to the issue of relief, it did not meet the strict charge of liability under Section 8(b) (2) for causing the employer to discriminate against the four in regard to hire, and under Section 8(b) (1) (A) for coercing employees in the exercise of their Section 7 rights.

The order of the Board, in addition to requiring cessation of the unfair labor practices, directed Local 2 to make whole the four men for all losses in pay sustained by reason of their being deprived of employment by Astrove from April 30, 1964, to a date five days after the Union's sending of a notice of withdrawal of objection. The Board rejected the contention that the men's failure to pass the test of May 18 warranted denial of an award for lost wages on the grounds that the test was inconclusive, had been illegally imposed as a condition to ending an illegal strike, and would have been pertinent only to priority among rival bidders for the jobs, which was not the issue on which the strike turned.

■ The inconclusive test of May 18 could not decide the issue of entitlement to back pay. However, the order of the Board does not appear to contemplate any inquiry in the back-pay proceeding (29 C.F.R. § 102.52 et seq.) into the question of the length of time Astrove would have kept the four men at work. That issue was not decided in the hearing, nor had the men demonstrated their employability, since they were never put to work. Compliance proceedings (Phelps Dodge Corp. v. N. L. R. B., 1940, 313 U.S. 177, 187–189, 197–200, 61 S.Ct. 845, 85 L.Ed. 1271) are directed to effectuating the purposes of the Act, and, within that broad purpose, in such a case as the present one, to making good only actual losses caused by the unfair labor practice. The right to back pay is not a punitory award for having been the victim of an unfair labor practice; it rests on the right to have had the work and presupposes the ability to do it. To award a man "wages which he could not have earned would not be remedial but punitive" (Chairman Farmer, concurring, in Local 57, International Union of Operating Engineers, 1954, 108 NLRB 1225, 1230). See N. L. R. B. v. U. S. Truck Co., 6th Cir. 1942, 124 F.2d 887, 889–890; N. L. R. B. v. Waterfront Employees, 9th Cir. 1954, 211 F.2d 946, 953; N. L. R. B. v. R. K. Baking Corp., 2d Cir. 1959, 273 F.2d 407, 411; N. L. R. B. v. Ozark Hardwood Co., 8th Cir. 1960, 282 F.2d 1, 8; The Red River Lumber Co., 1939, 12 NLRB 79, 89–90; Empire Worsted Mills, 1943, 53 NLRB 683, 690–692 (award approved, 2d Cir. Feb. 14, 1944); Roskam Baking Co., 1964, 146 NLRB 15, 17–18; cf. N. L. R. B. v. Mastro Plastics Corp., 2d Cir. 1965, 354 F.2d 170, 175; N. L. R. B v. Dazzo Products Inc., 2d Cir. 1966, 358 F.2d 136. Paragraph 2(b) of the Board's order must be modified to permit inquiry in the compliance proceeding into the length of time for which, but for the Union's activities, the four men, on the basis of their ability and other factors, would have been kept at work by Astrove.

■ Respondent contends that the arrangement worked out with the Mayor, under which the four men were admitted to the May 18 Union test under waivers of the Union's usual qualifying condi-

tions, should have been treated as a strike-settlement dispositive of the dispute. The contrary conclusion of the Board is well founded. The arrangement appears to have been directed to ending the strike and the demonstrations and to reducing public tension and the risk of disorder. The Hearing Examiner nevertheless considered the settlement in the broad perspective of its relation to formulating the remedy for the unfair labor practices that would be best calculated to effectuate the purposes of the Act. Since neither the Board, nor any of the four men—nor, indeed, Astrove—participated in the settlement, since it did not profess to end or to redress the unfair labor practices, and since it appeared to assume the validity of the Union's insistence that the four men had to qualify by Union standards, the Board rightly concluded that the settlement, if such it was, could not displace the remedial procedures of the Act. Cf. N. L. R. B. v. Erie Resistor Corp., 1963, 373 U.S. 221–224, 236–237, 83 S.Ct. 1139, 10 L.Ed.2d 308; N. L. R. B. v. Armstrong Tire & Rubber Co., 5th Cir. 1959, 263 F.2d 680, rehearing denied 265 F.2d 212.

The Board's order invalidated Article 2(a) of the collective bargaining agreement—the priority-in-employment provision—on the ground that in substance it contemplated and required membership in Local 2 as a condition of employment, contrary to Section 8(a) (3) and (f) (4) of the Act. The invalidation of Article 2(a) depends for semantic support on reading the words "qualified and competent" in the first sentence as words used to invoke the first alternative test of Section 8(f) (4)—"such agreement specifies minimum training or experience qualifications for employment." The second sentence, then viewed as giving specificity of "qualification" standards to the first sentence, is read, with the help of Section 40(K) of the Local 2 Constitution, as incorporating the Union procedure of certifying only its own member plumbers as qualified journeymen or apprentices.

The flagrant and foolish invalidity of Article 2(a) if so read suggests that it was not intended so to operate. Cf. Honolulu Star-Bulletin, Ltd. v. N. L. R. B., 1959, 107 U.S.App.D.C. 58, 274 F.2d 567, 569. The first sentence expectably pursues the second alternative of Section 8(f) (4)—legitimatizing bargaining agreements when "such agreement * * * provides for priority in opportunities for employment based upon length of service * * * in the particular geographic area." Limiting the geographical priority to "qualified and competent men" does not purport to "specif[y] minimum training or experience qualifications." The words "qualified and competent men" have no necessary limiting content beyond the obvious one of relating the sentence to men who are veritable plumbers; a meaning ought not to be imposed on the words that can only lead to invalidity. Cf. N. L. R. B. v. News Syndicate Co., 1961, 365 U.S. 695, 699, 81 S.Ct. 849, 6 L.Ed.2d 29; Local 138, International Union of Operating Engineers v. N. L. R. B., 2d Cir. 1963, 321 F.2d 130, 133–134. Compare the use of "qualified" in Section 8(f) (3). Standing alone, the first sentence of Article 2(a) is valid as a clause authorized by Section 8(f) (4).

The second sentence of Article 2(a) seeks to continue previous hiring practice, "including practice as to qualifications and competency" and adds that "members of the Union may be hired as in the past without regard to prior length of service." The plainest meaning of the sentence is that any Union man is to be hired in preference to any non-union man. So read, the second sentence of Article 2(a) is clearly invalid. N. L. R. B. v. Gottfried Baking Co., 2d Cir. 1954, 210 F.2d 772, 779–780; N. L. R. B. v. Local 269, IBEW, 3rd Cir. 1966, 357 F.2d 51; Local 138, International Union of Operating Engineers v. N. L. R. B., supra, 321 F.2d at 135; cf. N. L. R. B. v. Miscellaneous Drivers & Helpers Local 610, 8th Cir. 1961, 293 F.2d 437, 440–441.

The United Association, *amicus curiae*, suggests that the express

reference to "members of the Union" may be read as meaning "all local area plumbers" and that, so read, the clause abolishes seniority claims as among local plumbers but prefers them over plumbers from other areas. Cf. Local 138, International Union of Operating Engineers v. N. L. R. B., supra, 321 F.2d at 134. Respondent treats the second sentence broadly as intended to give local plumbers protection against out-of-town plumbers. See Bricklayers, Masons & Plasterers' International Union, 1961, 134 NLRB 751, 754; Painters District Council No. 3, 1964, 147 NLRB 79. The words used will not tolerate such a main-force effort at a mitigation of their meaning. Moreover, the remaining language of the second sentence continues "previous hiring practices in all respects." There was evidence that Union practice included recognition of an "imbedded" principle that members of Local 2 would not work for employers of non-union men. Section 40 (K) of the Local 2 constitution provided that no member of the Local may work for any employer who employs a non-union plumber. During the strike and in the hearing Union officials invoked the supposedly "imbedded" principle of Section 40(K) in a vain effort to explain away the strike as a set of concurrent but unconcerted individual acts. Since the collective bargaining agreement did not explicitly incorporate Section 40(K) of the Local 2 constitution, it was not on its face illegal (cf. N. L. R. B. v. News Syndicate Co., 1961, 365 U.S. 695, 699–700; N. L. R. B. v. Revere Metal Art Co., 2d Cir. 1960, 280 F.2d 96, 105); but the evidence, including the strike directly involved, that "hiring practices" in fact included recognition of the principle that members of Local 2 would not work with a non-union man, requires the conclusion that the second sentence of Article 2(a) is illegal as intended to be enforced by Local 2 in practice. Cf. N. L. R. B. v. H. K. Ferguson Co., 5th Cir. 1964, 337 F.2d 205, 208.

▮ Decision of the motion of the Urban League of Greater New York, Inc., for leave to intervene was deferred. Aft-

er the decision of International Union, U. A. A. & A. I. W., Local 283 v. Scofield, 1965, 382 U.S. 205, 217, 86 S.Ct. 373, 15 L.Ed.2d 272, the League moved on the authority of the *Scofield* case to intervene. Counsel for the League, who had also appeared and filed a brief for the National Association for the Advancement of Colored People as *amicus curiae* on which the League proposed to rely, participated in the oral argument. The League, although a charging party, had not an interest in the proceeding which, like the interest of an employer or employee, would be directly affected by the order of the Board. However, the *Scofield* case was not decided in terms that indicate that the right to intervene in appellate review depends on the nature of a charging party's interest in the proceeding (see International Union, U. A. A. & A. I. W., Local 283 v. Scofield, supra, 382 U.S. at 219, and fn. 14, 86 S.Ct. 373), and allowance of intervention here appears to be congruent with the general statutory purpose of encouraging disinterested initiatives of enforcement. See N. L. R. B. v. Indiana & Michigan Electric Co., 1943, 318 U.S. 9, 17–18, 63 S.Ct. 394, 87 L.Ed. 579; Hercules Powder Co. v. N. L. R. B., 5th Cir. 1961, 297 F.2d 424, 433; N. L. R. B. v. Chauffeurs, Teamsters & Helpers Local No. 364, 7th Cir. 1960, 274 F.2d 19, 25; Southern Furniture Mfg. Co. v. N. L. R. B., 5th Cir. 1952, 194 F.2d 59, 61; Local 282, Int'l Bro. of Teamsters, v. N. L. R. B., 2d Cir. 1964, 339 F.2d 795, 799–800; Associated Industries of New York State v. Ickes, 2d Cir. 1943, 134 F.2d 694, 704–705, dismissed as moot, 1943, 320 U.S. 707, 64 S.Ct. 74, 88 L.Ed. 414; 3 Davis, Administrative Law (1958) 225–226.

The motion of the Urban League of Greater New York, Inc. for leave to intervene is granted.

Paragraph 2(b) of the order of the Board is modified by interpolating after the words "pay sustained" the words "for the length of time for which, but for the Union's activities, the four men, on the basis of their ability and other factors, would have been kept at work by As-

trove"; and paragraph 1(d) is modified by deleting the quotation of the first sentence of Article 2(a), by interpolating after the words "Giving effect to" the words "the second sentence of," and by substituting the word "sentence" for the word "article" in the fourth line of the paragraph. Enforcement of the order as so modified is granted.

FRIENDLY, Circuit Judge (concurring and dissenting):

I concur in Judge Dooling's excellent opinion save insofar as it grants the motion of the Urban League for leave to intervene; as to that I dissent.

In International Union, United Automobile, Aerospace & Agricultural Implement Workers, etc., Local 133 v. Fafnir Bearing Co., 382 U.S. 205, 217, 86 S.Ct. 373, 381, 15 L.Ed.2d 272 (1965), the Supreme Court recognized that resolution of the problem "whether intervention should be granted to the successful charging party" was "no easy matter." Although the Court resolved that issue in favor of intervention by charging parties whose private interests are advanced by an order which the National Labor Relations Board seeks to enforce—typically, unions, employees or employers, I perceive no basis for thinking it meant to go further. The Board's Rules and Regulations allow a charge to be made "by any person," § 102.9—doubtless a wise provision since the only effect of a charge is to bring the matter to the attention of the General Counsel. Permitting "any person" who has filed a charge to intervene in enforcement proceedings is something else again. There is no need for welfare organizations to intervene before the courts to vindicate the public interest as "private attorneys general," see Associated Industries of New York State v. Ickes, 134 F.2d 694, 704–705 (2 Cir.), dismissed as moot, 320 U.S. 707, 64 S.Ct. 74, 88 L.Ed. 414 (1943), when a "public attorney general" is pressing the case, cf. L. Singer & Sons v. Union Pac. R. R. Co., 311 U.S. 295, 305–306, 61 S.Ct. 254, 85 L.Ed. 198 (1940) (concurring opinion of Mr. Justice Frankfurter), and intervention on so broad a scale creates danger of conflict not merely with the Board but with those whose private interests are furthered by the Board's order. I see no reason why all proper concerns of worthy organizations like the Urban League and the NAACP in the enforcement of orders of the Labor Board are not fully met, as they generally are in other types of litigation, by the liberal granting of leave to appear as *amicus curiae*. If the organization fears that an employee who has succeeded before the Board may not have the means to hire counsel and intervene in his own name, nothing prevents its arranging appropriate assistance.