NATIONAL LABOR RELATIONS
BOARD, Petitioner,

v.

E. L. CLARK, Owner, Jim H. Pierce, Lessee of the Ashville-Whitney Nursing
Home, Respondents.

No. 71-2541.

United States Court of Appeals,
Fifth Circuit.

Oct. 4, 1972.

Marcel Mallet-Prevost, Asst. Gen. Counsel, N.L.R.B., Washington, D. C., Walter C. Phillips, Director, Region 10, N.L.R.B., Atlanta, Ga., Stuart M. Rosenblum, Washington, D. C., N.L.R.B. for petitioner.

C. V. Stelzenmuller, Birmingham, Ala., for respondents.

Before WISDOM, GODBOLD and RONEY, Circuit Judges.

WISDOM, Circuit Judge:

This cause comes here on application for enforcement of an order of the National Labor Relations Board holding that the respondents refused to hire certain employees in violation of Section 8(a)(1) and (3) of the National Labor Relations Act, as amended, 29 U.S.C. § 151 et seq., and requiring respondents to remedy the alleged violation. We deny enforcement and remand the case for further evidence because the record will not support the Board's assertion of statutory jurisdiction over the enterprise operated by the respondents.

I.

At the outset, we are met with the contention that the proceedings before the trial examiner and the Board are of no effect because preceded by improper service of process on the respondents.

Some factual background is in order. Before September of 1969, one S. P. Robinson owned a nursing home in Ashville, Alabama. The home was operated by Mid-South Convalescent and Medicare Centers, Inc. as Robinson's lessee. Mid-South became embroiled in a dispute with the Retail, Wholesale, and Department Store Union, AFL-CIO. At the end of August 1969, Mid-South ceased to operate the Ashville facility and removed its patients. E. L. Clark bought the home some time in August and took physical possession of the premises about August 31, 1969. Clark employed respondent Jim H. Pierce as his "administrator" (or manager) in accordance with Alabama law. Under Clark's ownership and Pierce's administration, the home did not employ any of the former employees of the home during Mid-South's tenure. The union attributed this failure to the union affiliation of many of the former employees. This failure to hire, allegedly on account of union affiliation, is the substantive conduct at the core of this labor dispute.

After only a few months of operating the home as owner, and after the alleged commission of unfair labor practices, Clark leased the home to Pierce on January 1, 1970. The trial examiner found:

"In September, 1969, Ashville-Whitney Nursing Home was a sole proprietorship of E. L. Clark, an individual with his place of business located at Ashville, Alabama. . . . Respondent Jim H. Pierce was the administrator of the nursing home for Mr. Clark. On January 1, 1970, Mr. Pierce leased the building and equip-

ment from Mr. Clark and since that time has been the lessee-operator of the Ashville-Whitney Nursing Home. Mrs. Pierce became acting administrator until May 11, 1970, when she became the administrator.

. . . I further find, as is self-evident from the record, that on and after January 1, 1970, 'Respondent, Jim H. Pierce, as the lessee-operator of the Ashville-Whitney Nursing Home, was a successor of Respondent E. L. Clark. . . . . Clark operated the Ashville-Whitney Nursing Home from September 22, 1969, to January 1, 1970, when the premises were leased to Pierce who then became the lessee-operator. . . . I have also found that Respondent James [sic] H. Pierce operated the Ashville-Whitney Nursing Home on and after January 1, 1970, as the successor of Respondent Clark."

On March 6, 1970, the union filed an unfair labor practice charge[1] with the Board, naming the "employer against whom the charge is brought" as "Ashville and Whitney Nursing Home" and "the employer representative to contact" as "Mr. E. L. Clark, Owner" and "Mr. Jim Pierce, Admn." The charge was addressed to "Ashville and Whitney Nursing Home, Route #2, Ashville, Alabama," and there received by Jim Pierce on March 6, 1970. As of March 6, Pierce had leased the home from Clark, but the only public record dealing with ownership and management of the home, the Alabama State license application to operate the home, continued to list Pierce as administrator and Clark as owner. The lease was not filed with the State Board of Licensure until May 11, 1970, two months after service of the charge. So far as the record reveals, neither Clark nor Pierce took any steps to notify the union or the Board of the change in the ownership of the enter-

prise after January 1, before or after the charge was received by Pierce on March 6.

On June 10, 1970, the Board issued a complaint, naming "Ashville-Whitney Nursing Home" as respondent and, in paragraph 2, stating that "Respondent is and has been at all times material herein, a sole proprietorship of E. L. Clark." The complaint stated that Pierce "is and has been at all times material herein, the administrator of Respondent's operations at Ashville, Alabama." Copies of the complaint were sent by registered mail to Ashville-Whitney Nursing Home and to Gerald Swann, attorney for Pierce. During the course of the hearing, the caption on the complaint was amended to read "Ashville-Whitney Nursing Home and J. H. Pierce, Lessee", with the consent of Swann on Pierce's behalf. The trial examiner found Clark and Pierce jointly liable for the restitutional remedies it imposed.

On the basis of these facts, the respondents argue that there was no proper service of the charge or the complaint on Clark or on any authorized agent for service of process on Clark. They argue that the charge was made against Clark but was served only on Pierce, at the home, and on Pierce's lawyer, Swann. Further, respondents argue that the complaint was not properly served on Clark through Pierce when the complaint was served at the home on June 10, 1970.

These contentions were advanced before the Board. The Board held that "for the purposes of service [of process] Clark held Pierce out to be his apparent agent until May 11, 1970, so that the charge filed on March 5, 1970, and received by Pierce on March 6, 1970, constituted valid service on Clark." The Board reasoned that the lease agreement, though purportedly executed on

---

[1]. An unfair labor practice case is initiated by the filing of a charge with the Board; an investigation ensues and, if it appears that formal proceedings should be instituted, a complaint will issue based on the charge. Section 10(b), National Labor Relations Act, 29 U.S.C. § 160(b); Board Rules and Regulations, Section 102.15, 29 CFR § 102.15.

January 1, 1970, was not a matter of public record until May 11 of that same year.

## II.

█ Under Rule 4(d) of the Federal Rules of Civil Procedure, service upon "an individual other than an infant or an incompetent person" is proper if served "in the manner prescribed by any statute of the United States." Rule 4(d)(7).[2] The NLRA provides, in section 10(b), that both the charge and the complaint must be served upon "the person against whom such charge is made."[3] Section 11(4) adds that "complaints . . . and other process and papers of the Board . . . may be served . . . by registered mail or . . . by leaving a copy at the principal office or place of business of the person required to be served."[4] A Board charge constitutes "other process and paper" within the meaning of section 11(4). NLRB v. Columbus Marble Works, 5 Cir. 1956, 233 F.2d 406.

In considering service of the charge on Clark, we must decide whether service was accomplished on the facts of this case "by leaving a copy at the principal office or place of business" of Clark. A threshold question is whether "principal" modifies "place of business" as well as "office". For purposes of argument and no more, we assume that the correct reading is "principal office or [principal] place of business."

██ Even this reading of the statute does not imply, as the respondents suggest, that if process is to be served upon an employer engaged in several enterprises, the server must determine the employer's most important or "principal" site of financial endeavor. Such a determination would be exceedingly precarious and far more technical than fair notice requires. Rather, service is appropriate at the principal place of business of *that particular business* giving rise to the labor dispute with the person required to be served. We may assume respondent Clark to have been engaged in several enterprises. Still, for the purposes of section 11(4) he could be served at the principal place of business of his nursing home operation, provided that the process and papers sought to be served related to labor relations of the nursing home operation. Whatever Clark's other places of business, his principal place of business for the Ashville-Whitney Nursing Home operation was the home itself. Even assuming that section 11(4) requires service at the principal place of business, then, we have no trouble concluding that service on Clark would have been appropriate at the home until January 1, 1970.

█ Turning now to service on Clark at the home *after* January 1, 1970, we agree with the Board that the undisclosed lease arrangement between Clark and Pierce did not invalidate the service of the charge on Clark at the home on March 6, 1970. The Board con-

2. Section 10(b) of the Act provides that any unfair labor practice proceeding before the Board "shall, so far as practicable, be conducted in accordance with the rules of evidence applicable in the district courts of the United States under the rules of civil procedure for the district courts of the United States. . . ."

3. Section 10(b) provides, in pertinent part, that "no complaint shall issue based upon any unfair labor practice occurring more than six months prior to the filing of the charge with the Board and the service of a copy upon the person against whom such charge is made . . . ."

4. Section 11(4) provides, in pertinent part:

"Complaints, orders, and other process and papers of the Board, its member, agent, or agency, may be served either personally or by registered mail or by telegraph or by leaving a copy thereof at the principal office or place of business of the person required to be served. The verified return by the individual so serving the same setting forth the manner of such service shall be proof of the same, and the return post office receipt or telegraph receipt therefor when registered and mailed or telegraphed as aforesaid shall be proof of service of the same."

cluded that Pierce was Clark's apparent agent at the time the charge was served. Section 11(4) of the NLRA makes no reference to service on agents, however, and accordingly we base our conclusion that service was properly effected under section 11(4) on different reasoning. Service of the charge on Clark at the home was valid because, to all possible outward appearances, the home on March 6 was still Clark's "principal place of business" within the meaning of section 11(4). This was, substantially, Clark's own doing. Not only did Pierce operate the home as the successor of Clark, as the trial examiner found, but there was also a total continuity between the Pierce and Clark operations. Pierce continued to manage the home, as he had in his former capacity as Clark's administrator. Clark continued to derive substantial rental income from the home. The Alabama state license application, the only available public record dealing with the home's ownership, still showed that Clark was the home's owner and that Pierce was "Administrator/Person in charge" on March 6, though the lease was allegedly executed and the business was allegedly sold on January 1. The lease was not filed with the State Bureau of Licensure and Certification until May 11, and apparently no effort was ever made to change the license.

■ In attempting to serve Clark by mail the NLRB was justified in relying on these outward appearances. We find no cases under section 11(4) dealing directly with the question in this case. But would-be process servers are not entirely at the mercy of elusive defendants. Courts have held that, where a defendant has in fact changed his residence but to all appearances is still occupying a former dwelling, substituted service at the former dwelling is proper under Rule 4(d)(1) or similar statutes. See Blackhawk Heating & Plumbing Co. v. Turner, 1970, D.Ariz., 50 F.R.D. 144; Rich Products Corp. v. Diamond, Sup. Ct.1966, 51 Misc.2d 675, 273 N.Y.S.2d 687. See also Skidmore v. Green, 1940,

S.D.N.Y., 33 F.Supp. 529. A defendant who beclouds his whereabouts should not be entitled to benefit from the process server's consequent confusion. See Blackhawk Heating & Plumbing Co., 1970, D.Ariz., 50 F.R.D. 144; Pickford v. Kravetz, 1952, S.D.N.Y., 17 Fed.Rules Serv. 4d.121, Case. 1. This case is similar. Clark, by his own actions, created the appearance that the home remained his principal place of business. He is not entitled to benefit from this confusion.

■ Our conclusion is not altered by the lack of evidence that Clark received actual notice of the action against him. The record also does not contain any statement by Clark denying that he received notice, and there is a strong inference from all the facts that he had notice. But in any event due process does not require receipt of actual notice in every case. Service upon Clark at the home was constitutionally adequate since it was "a form of notice reasonably calculated to give [Clark] knowledge of the proceedings and an opportunity to be heard." NLRB v. O'Keefe & Merritt Mfg. Co., 9 Cir. 1949, 178 F.2d 445.

■ Nor does the statute impose a more stringent standard. It is true that courts and commentators have often said that receipt of actual notice should be the test of sufficiency of substituted service under Rule 4. See, e. g., 4 C. Wright, Federal Practice and Procedure § 1096, at 366–67 (1969); Nowell v. Nowell, 5 Cir. 1967, 384 F.2d 951; Karlsson v. Rabinowitz, 4 Cir. 1963, 318 F.2d 666. But actual notice has not been required in every case. See, e. g., Pickford v. Kravetz, 1952, S.D.N.Y., 17 Fed.Rules Serv. 4d.1221, Case 1. And this case is exceptional. Section 11(4) should be read broadly to effectuate Congressional labor policies. See NLRB v. Strickland, 1962, W.D.Tenn., 220 F.Supp. 661. The evident Congressional purpose in enacting section 11(4) was to enable the NLRB to serve complaints and other papers by registered mail. Were we to hold that Clark has successfully evaded

the process server we would defeat this policy. Potential defendants could easily insulate themselves from service by mail by carrying out secret alterations in the structure of their businesses and subsequently denying knowledge of the attempt at service, a contention difficult to disprove. To effectuate the congressional policy in favor of service by mail, it is necessary that the NLRB be able to judge the quality of its attempts at service by something other than the fortuity of whether a defendant can be shown to have had actual notice. The proper test in this case is whether in the circumstances the procedure used would in all probability have informed the defendant of the proceedings against him. See Blackhawk Heating & Plumbing Co. v. Turner, 1970, D.Ariz., 50 F.R.D. 144; 17 U.Kan.L.Rev. 125 (1968). The NLRB met this requirement by sending the charge to what, from all appearances, was Clark's principal place of business.

■ Having concluded that the charge was properly served on Clark on March 6, 1970, we similarly hold that the complaint was properly served on Clark at the home on June 10, 1970. From the Board's vantage point nothing had changed since March 6, except that the lease had been filed with the Alabama Bureau of Licensure and Certification on May 11. But this lease nowhere indicated that Clark had sold the business to Pierce. Nor did Clark make any effort to change the state license application on file, which on June 10 still described him as owner of the home. Therefore the home continued to be Clark's apparent principal place of business on June 10. For the reasons already stated, then, service of the complaint on Clark at the home was appropriate under section 11(4) and Rule 4(d).

### III.

■ Respondent Pierce argues that no charge against him was filed with the Board or served on him within the six month limitation period prescribed by section 10(b) of the Act, 29 U.S.C. § 160(b). Pierce contends that at the time the charge was served on him, on March 6, it failed to notify him that he was "the person against whom such charge [was] made." Later, Pierce says, when the complaint was amended to make clear that Pierce was a named respondent, six months had elapsed since the alleged unfair labor practice occurred.[5]

Pierce's contentions are unsound because, like Clark's, they proceed from the mistaken assumption that one who possesses crucial information may conceal the information and then successfully capitalize on his own misleading behavior. Pierce admitted receiving the original charge on March 6, 1970. The charge named the home as employer, Pierce as administrator, and Clark as owner. In fact, as of January 1, 1970, Pierce knew these descriptions were inaccurate. No wonder, then, that the charge was never amended to name Pierce specifically as owner or lessee-operator within the six months limitation period. We conclude that, interpreted in light of Pierce's own, undisclosed knowledge, the charge adequately identified Pierce as a "person against whom the charge is made."

Respondents cite Darlington Mfg. Co., 139 NLRB 241, 259 (1962) in support of their contention that the March 6 charge was, as a matter of interpretation, directed against Clark and not against Pierce individually. The interpretation of the charge in *Darlington* is inapposite here. In that case, there was no showing of a change in ownership, not disclosed, providing what would have been certain grounds for a timely amend-

5. The initial charge alleged violations of Section 8(a)(1) and (3) of the Act on and after September 21, 1969. The six-

month period of limitations provided by Section 10(b) of the Act would expire on or about March 22, 1970.

ment to a charge arguably inadequate to reach a particular party.

Because we hold that the charge sufficiently identified Pierce, the complaint issued on the basis of the charge complied with section 10(b) of the Act. Whatever defects appeared on the face of the complaint were attributable to Pierce's own silence. In addition, the record is clear that Pierce had adequate actual notice that the proceedings were directed against him as well as against Clark. The complaint was served by registered mail addressed to the home and to Swann, Pierce's attorney. Pierce appeared with attorney Swann before the trial examiner. At the hearing, Pierce's attorney consented to the addition by motion of Pierce's name to the caption and body of the complaint as a named respondent. The amendment conformed to Section 102.17 of the Board's Rules and Regulations, 29 CFR § 102.17.

■ Hercules Powder Company v. NLRB, 5 Cir. 1961, 297 F.2d 424, 433, cited by respondents, holds that the Board cannot initiate unfair labor practice proceedings by complaint against a party until its machinery is set in motion by the filing of a charge against the offending party by another private party. Here, though, there is no reason for concern that the Board is trying to proceed against a party not designated, or intended to be designated, by the union. *Hercules Powder* is consistent with our holding today that technical defects on the face of a charge can be modified to reflect the clear intent of the charging party when the conduct of the person plainly sought to be charged has given rise to the initial confusion.

In short, we conclude that both Clark and Pierce were properly served with charge and complaint.

## IV.

The respondents' objections to subject matter jurisdiction on this record are more substantial. Annual gross revenues of the home exceeded the Board's $100,000 jurisdictional yardstick for nursing homes. See University Nursing Homes, Inc., 168 NLRB 263 (1967). The record also dislcoses that the home purchased $1700 in supplies during a year of operation from Ipco, a firm whose "main office" is located in Atlanta, Georgia. The Board argues that the operations of the home had more than a minimal effect on interstate commerce because money paid by the home to Ipco "inured to the benefit of that out-of-state corporation."

The respondents contend that the record is far too thin to support the requisite finding of a greater than minimal effect on interstate commerce. Respondent Pierce testified that Ipco's "head office" is located in Atlanta, that a salesman located in Birmingham arranged shipments to Ashville, that the shipments arrived "by Beeline truck . . . an Alabama concern", but that he had no knowledge of where Ipco's shipments originated from. Nothing in the record discloses whether amounts due were paid by the home to Ipco's salesmen or to Ipco directly. Nothing in the record indicates any of the details of Ipco's corporate structure, nor whether Ipco is a corporation domiciled outside of Alabama, nor for that matter whether Ipco is a corporation at all. In short, we know nothing more than that the home bought supplies from Ipco and Ipco had its "main office" in Atlanta.

■ In passing the National Labor Relations Act, Congress intended to provide the Board with the fullest jurisdictional power constitutionally permissible under the Commerce Clause. NLRB v. Reliance Fuel Oil Corp., 1963, 371 U.S. 224, 226, 83 S.Ct. 312, 9 L.Ed. 2d 279; NLRB v. Jones & Laughlin Steel Corp., 1937, 301 U.S. 1, 31, 57 S. Ct. 615, 81 L.Ed.2d 893. If intrastate activity has more than a de minimis effect on interstate commerce, it affects commerce within the meaning of the Act. E. g., NLRB v. West Side Carpet Cleaning Co., 6 Cir. 1964, 329 F.2d 758, 760; NLRB v. Peyton Fritton Stores, 10 Cir. 1964, 336 F.2d 769, 770. Broad though the Board's jurisdiction be, it is

not indeterminate, and must appear from the record; it cannot be presumed. In an enforcement proceeding, the burden of demonstrating jurisdiction is upon the Board. NLRB v. Ingram, 5 Cir. 1961, 273 F.2d 670; Birmingham Post Co. v. Brown, 5 Cir. 1954, 217 F.2d 127.

The present record is so ambiguous that it would require an act of faith for us to conclude that the home's purchases from Ipco "affect commerce" within the meaning of the Act. For all we know, Ipco may have an independent Alabama subsidiary. See NLRB v. Shawnee Milling Co., 10 Cir. 1950, 184 F.2d 57. It may even be an Alabama corporation. Revenues derived from Alabama sales of Ipco products may never leave Alabama, and there is admittedly no evidence proving interstate movement of Ipco products. If these possibilities are true, the effect on interstate commerce of the home's dealings with Ipco would be—at least on the surface—quite remote.

██ ██ However, we need not decide whether the effect on commerce, under these speculative circumstances, would be too remote to support the Board's jurisdiction. Neither the trial examiner's decision nor the Board's decision embraces the jurisdictional theory now advanced on appeal. The trial examiner concluded only that "purchases of supplies have been made from Ipco of Atlanta, Georgia," later referring to these as "interstate purchases." The Board affirmed without elaboration on this point. The trial examiner's language strongly suggests the direct purchase of goods from out-of-state. There is room for the interpretation now advanced by the Board, but nothing approaching a statement of the "interstate financial benefit" theory. It is well settled that the reasons actually advanced by an administrative agency are the only reasons properly considered by a court in determining the legality of the agency's action. Securities and Exchange Commission v. Chenery Corp., 1943, 318 U.S. 80, 63 S.Ct. 454, 87 L.Ed. 626;

Trailways of New England, Inc. v. Civil Aeronautics Board, 1 Cir. 1969, 412 F.2d 926. We therefore hold that the present record will not support a finding of statutory jurisdiction over the respondent's enterprise.

V.

In the interest of judicial economy. and in light of our remand order, we have considered respondents' further contentions that the trial examiner erred in allowing Pierce to be called as a witness under Rule 43(b). We have also considered certain evidentiary objections to rulings of the trial examiner raised by the respondents; and the respondents' objection to the trial examiner's decision, upheld by the Board to predicate liability on Pierce on a theory of successorship. We see no merit in respondents' arguments.

Because the present record will not support a finding of statutory jurisdiction over the respondents' enterprise, enforcement of the Board's order is Denied and the cause Remanded to the Board for additional evidence, findings of fact, and conclusions of law consistent with this opinion. See Ford Motor Co. v. NLRB, 1939, 305 U.S. 364, 59 S.Ct. 301, 83 L. Ed. 221.

GODBOLD, Circuit Judge (dissenting):

I have difficulty with the conclusion that Clark is jointly liable with Pierce, predicated upon valid service upon Clark of the charge and the complaint. I agree that the purported service upon Clark was not unconstitutional. But I disagree as to the statutory adequacy of service under 29 U.S.C. § 161(4).

There is no evidence that Clark received actual notice. There is no evidence, or even contention, that the Board relied upon, or even knew about, the records of the state licensing authority. What the Board did know about and did rely upon was that the nursing home, which formerly was owned by Clark, continued in operation with no

outward change and with Pierce, who had been the administrator, continuing in charge.

In the absence of a requirement of statute, the citizen has no duty to inform a govermental agency which subsequently may subject him to administrative action, or to inform the world at large, when he sells or leases his business or ceases to carry on business at the place that theretofore had been his principal place of business. The concept of an "apparent place of business" is a new wrinkle. If Congress had meant "what appears to be a principal place of business," it would have been easy to say so. There is enough confusion over whether an agent by estoppel is an agent for purposes of service of process, see 2 Moore, Federal Practice ¶¶ 4.12, at 1052, 1056–57, 4.22[1], at 1116–19 (2d ed. 1970); 30 A.L.R. 176, without burdening the law with an "apparent place of business" concept.

Cases holding that a former dwelling is a "usual place of abode" within the meaning of Fed.R.Civ.P. 4(d)(1), which provides for service on an individual "by leaving [the summons] at his dwelling house or usual place of abode," do not support the holding in this case. The transiency of some individuals occasionally persuades courts to impart elasticity into the term "usual place of abode." See, e. g., Skidmore v. Green, 33 F.Supp. 529 (S.D.N.Y.1940). Businesses are not as transient as individuals, however, and there is no concomitant need to stretch "principal place of business" beyond its common import.

Even without analysis of legislative policies underlying the "principal place of business" requirement, the majority's precedents are readily set apart from this case by the force of their own facts. For example, in Blackhawk Heating & Plumbing Co. v. Turner, 50 F.R.D. 144 (D.Ariz.1970), the court upheld service on an individual by service on his daughter at his alleged "former" apartment. In support of its holding, the majority noted, inter alia, that at the time of

service (1) defendant was paying rent for the apartment, (2) defendant had not notified the apartment manager that he had moved, (3) the apartment manager considered defendant his lessee, (4) defendant left the family automobiles at the apartment, and (5) defendant received his mail at the apartment. Additionally, the court relied heavily on the defendant's actual receipt of notice. "[T]here is no claim of . . . prejudice by reason of the manner or time in which notice was received . . . ." *Id.* at 149. In this case, the Board did not establish a nexus between Ashville-Whitney and Clark at the time of the purported service even approximating the nexus established in *Blackhawk Heating*, nor, more importantly, did the Board establish actual notice to Clark.