**FRANK KEEVAN & SON, INC., Plaintiff,**

v.

**CALLIER STEEL PIPE & TUBE, INC., Defendant/Third Party Plaintiff,**

v.

**MID–ATLANTIC PIPE COMPANY, Birchminster Industries, Inc., and Vincent V. Roggio, Third Party Defendants.**

**No. 79–1369–Civ.**

United States District Court, S.D. Florida, Miami Division.

Sept. 10, 1985.

---

Harley Tropin, Miami, Fla., for Callier Steel Pipe.

Thomas Hurst, Miami, Fla., for Vincent Roggio.

## MEMORANDUM OPINION AND ORDER DENYING MOTIONS TO VACATE DEFAULT AND FINAL DEFAULT JUDGMENT

SPELLMAN, District Judge.

On June 7, 1982, Callier Steel Pipe and Tube, Inc. ("Callier") obtained a final default judgment against Vincent V. Roggio ("Roggio") in the amount of $150,000.00. Four days later, Roggio filed motions to set aside the default and final default judgment, claiming invalid service of process and lack of personal jurisdiction. This Court conducted an evidentiary hearing to explore the validity of the June 7, 1982 default judgment. The opinion that follows constitutes this Court's findings of fact and conclusions of law.

### I

On January 8, 1979, the plaintiff, Frank Keevan & Son, Inc. ("Keevan"), sued Callier, a broker of pipe, alleging negligence and breach of contract arising from its purchase from Callier of allegedly defective pipe. Callier, in turn, sued the manufacturer, Mid-Atlantic Pipe Company ("Mid-Atlantic"), for indemnity. On May 16, 1980, Callier amended its third party complaint to add Roggio and Birchminster Industries, Inc. ("Birchminster"), the owner of Mid-Atlantic, as additional third party defendants. Mid-Atlantic and Birchminster were both represented by David L. Kahn until July 25, 1980, when Kahn withdrew as counsel for both parties.

Callier first attempted to serve Roggio through the United States Marshal by requesting service on Roggio at the corporate headquarters of Birchminster in Telford, Pennsylvania. Roggio, chairman of the board and principal shareholder of Birchminster, admittedly spent some time at its corporate headquarters. The United States Marshal, despite several attempts, was unable to locate Roggio and thus could not serve him. The Marshal's return of service indicates that he was told "Roggio was living and working in Miami."

Unable to serve Roggio at his Pennsylvania business, Callier then hired a private investigator, Ron Marone, of the Philadelphia law firm Pepper, Hamilton & Scheetz, to serve Roggio personally. Although Marone's efforts to find Roggio at Birchminster proved unsuccessful, he left a copy of the summons and third party complaint with the Birchminster receptionist in late July, 1980. On August 7, 1980, David Richman, a partner in the Pepper, Hamilton & Scheetz law firm, contacted Birchminster's general counsel, Neil Peterson, in an attempt to ascertain Roggio's whereabouts. Peterson informed Richman that he was unaware of Roggio's location, and refused to divulge a telephone number he

said he had for Roggio in Florida. Peterson knew of Marone's efforts to serve Roggio at Birchminster; the receptionist forwarded to Peterson the summons and third party complaint directed to Roggio.

Pursuant to the Pennsylvania Rules of Civil Procedure, Callier then attempted to serve Roggio by substituted service of process. Callier's motion for substituted service was granted by a Philadelphia court; Callier thus sent a copy of the summons and third party complaint by registered mail to P.O. Box 282 in Norristown, Pennsylvania, the address Marone had learned belonged to Roggio. Service was effected and Callier received a return receipt executed by "Vincent Roggio."

Roggio now claims in his Affidavit in Support of the Motion to Vacate Judgment, that the Norristown address was that of Vincent D. Roggio, Roggio's first cousin.[1] The cousin never responded in any way to the summons or complaint, either to the Court or to Callier. He did, however, notify Roggio's liason man, Charles Ascenzi, of the service.

■ Even after serving Roggio's Birchminster receptionist and achieving substituted service by mail Callier made another attempt in August of 1980 to personally serve Roggio at a farm he owned in Reddick, Florida. Ethel Rivers, Callier's Florida process server, attempted to give the process to Ann Eckland, Roggio's housekeeper. Eckland told Rivers, however, that Roggio had moved from the farm on April 15, 1980, and had listed the farm for sale. The housekeeper added that Roggio would not be returning, so the process server was unable to leave process.[2]

Nonetheless, Callier reasonably assumed that by virtue of its efforts in Pennsylvania, service had been effected on the "correct" Roggio, and proceeded with the litigation. Callier informed the Court of its efforts to serve Roggio in its September 4, 1980 Notice of Certificate of Service Upon Vincent Roggio. This Court, after reviewing the Notice and after hearing a brief discussion of Callier's service efforts at an October 3, 1980 status conference, ordered Callier to obtain a default against Vincent Roggio.

■ Wholly apart from Callier's efforts to serve Roggio, however, this Court is convinced that Roggio received constructive notice of the pendency of this lawsuit against him through his involvement in the lawsuit against Mid-Atlantic and Birchminster as Birchminster's chairman. Roggio's counsel, Kahn, aside from representing Roggio personally, represented Roggio's closely-held corporations, Birchminster and Mid-Atlantic, in the instant litigation until Birchminster filed for bankruptcy and Kahn withdrew as counsel for both companies.

Upon his withdrawal, Kahn notified the Court pursuant to Roggio's instructions, that all pleadings in the case should be served upon Kenneth Kuriger, an officer of Mid-Atlantic. Kahn's withdrawal was over two months after the filing of the amended third party complaint, which named Roggio individually, and after the Court granted Callier's motion to appoint its Pennsylvania process server, Mr. Marone, to serve Roggio. Certainly, Kahn, Roggio's personal attorney as well as his company's lawyer, notified Roggio that Roggio was named as

---

1. At the June 14, 1982 emergency hearing on Roggio's Motion to Vacate the Default, David Kahn, Roggio's attorney, represented that there was "no blood relation" between Roggio and Vincent D. Roggio and that the two were "not close." It now develops that Vincent D. Roggio is Roggio's first cousin, had lived with Roggio for several years and had been employed by Roggio on various occasions.

2. This Court is aware of the conflict in the testimony presented. The housekeeper, Ann Eckland, states that she did not tell Ethel Rivers,

Callier's Florida process server, that Roggio had moved. This Court, however, chooses not to credit Eckland's version of the meeting. The choice to credit some testimony and reject other versions of events is clearly within the province of the trier of fact. *See Simkin v. Norcross*, 610 F.Supp. 691 (S.D.Fla.1985). This Court is in the best position to weigh the testimonial evidence since it observed the witnesses and evaluated their credibility. This Court has also evaluated the testimony contained in the submitted depositions.

a third party defendant in the lawsuit and that Callier was attempting to serve him.[3] It is undisputed that Kahn represented Roggio personally in this matter (as well as other matters) before, during and after this litigation until this Court ordered Kahn to withdraw. In addition, Mr. Kuriger, Roggio's designee, was sent copies of all pleadings including the Notice of Certificate of Service, this Court's Order directing Callier to obtain a default against Roggio, and the October 28, 1980 Default itself.

Because of a bankruptcy court stay, Final Judgment by Default was not entered against Roggio until June 7, 1982. On June 11, 1982, four days after the Final Judgment and almost two years after the default was entered against him, Roggio filed motions to vacate the default and the default judgment for invalid service of process and lack of personal jurisdiction. Roggio claimed that the default was void because Callier never served him with a summons or third party complaint. Roggio also stated that "[t]his motion is made at or about the time that the defendant learned for the first time that a default was entered against him." In his Affidavit in Support of the Motion to Vacate Final Judgment, Roggio averred:

3. That he was never served by mail or otherwise with a Second Amended Third Party Complaint brought by CALLIER STEEL PIPE & TUBE, INC.

\* \* \* \* \* \*

9. That he has never been notified by any means or source, that a suit was pending against him as a result of service of process effected August 21, 1980 in the instant case, nor has he ever voluntarily submitted himself to the jurisdiction of this Court in such cause.

At the emergency hearing on Roggio's Motion to Vacate the Default, this Court noted Roggio's contentions that he had never been served or had any knowledge of the attempted service. This Court further noted that Kahn was, at all relevant times, counsel for Birchminster, Roggio and Mid-Atlantic. Because of the incredible nature of Roggio's position—that Kahn represented Roggio during this litigation but for some reason never advised him that he was a third party defendant in the lawsuit or that service was attempted upon him—this Court ordered the production of Kahn's files for an in camera inspection to determine whether Roggio had actual or constructive notice of the amended third party complaint or of the attempts to serve him.

The documents produced from Kahn's file indicate that Kahn had spoken to Roggio after Kahn received the amended third party complaint which named Roggio as a third party defendant. More importantly, Kahn billed Roggio for the telephone call. *See* footnote 3. Kahn, in his letters to Roggio and others, repeatedly referred to Roggio as the "general managing officer" of Birchminster and Mid-Atlantic. Kahn wrote to Roggio "as principal" several times concerning the status of the lawsuit and asked Roggio to arrange payment of his statements.

---

**3.** According to Wright, Miller and Kane:

Both the default entry and judgment play an important role in the maintenance of an orderly, efficient judicial system. They are significant weapons for enforcing compliance with the rules of procedure and therefore facilitate the speedy determination of litigation. The default procedure offers a useful remedy to a good faith litigant who is confronted by an obstructionist adversary. It also represents a means of encouraging an unwilling or uncooperative party to honor the rules established for litigation in the federal courts and provides the nondefaulting party an expeditious path to follow when his adversary does not do so or simply abandons the contest. But if default is to be an effective sanction, relief under Rule 55(c) cannot be granted too readily.

There is another policy that inhibits the easy vacation of default judgments—finality of judgments and the termination of litigation. Effective judicial administration requires that at some point disputes be treated as finally and definitively resolved. The general relief from judgment provisions in Rule 60(b), which are made applicable to, default judgments by Rule 55(c), necessarily conflict with that objective; yet, it also is clear that under certain circumstances justice requires that a case be revived.

C. Wright, A. Miller & C. Kane, *Federal Practice and Procedure* § 2693 at 477–79 (1983) (footnotes omitted).

Kahn now dismisses these letters as "self-serving" and claims that he never mentioned to Roggio that Roggio was named as a third party defendant in the amended third party complaint. Kahn does recall, however, mentioning to Roggio the "possibility" that he would be named as a third party defendant. This Court chooses not to credit Kahn's testimony.

## II

■ A motion to vacate a default judgment is addressed to the sound discretion of the district judge. *See United States v. Erdoss*, 440 F.2d 1221, 1223 (2d Cir.1971), *cert. denied*, 404 U.S. 849, 92 S.Ct. 83, 30 L.Ed.2d 88 (1971). Default judgments implicate sharply conflicting policies, *see* 10 C. Wright, A. Miller and M. Kane, *Federal Practice and Procedure* § 2693 at 477–93 (1983), and the trial judge, who is "the person most familiar with the circumstances of the case and is in the best position to evaluate the good faith and credibility of the parties," *Davis v. Musler*, 713 F.2d 907, 912 (2d Cir.1983) (quoting 10 C. Wright, A. Miller and M. Kane, *Federal Practice and Procedure* § 2693 at 475 (1983)), is entrusted with the task of balancing these competing considerations.

■ On the one hand, default judgments are not favored. There is a strong public policy in favor of resolving lawsuits by a trial on the merits. *See Dolphin Plumbing Co. v. Financial Corp. of North America*, 508 F.2d 1326, 1327 (5th Cir.1975) (per curiam). On the other hand, this Court has a "duty to protect the integrity of the judicial process." *Id.* [4]

Fed.R.Civ.P. 60(b) specifies mistake, inadvertence, surprise, excusable neglect, newly discovered evidence, fraud, misrepresentation, or other misconduct of an adverse party as grounds for setting aside a judgment. These provisions are made applicable to default judgments by Fed.R. Civ.P. 55(c) which authorizes setting aside default judgments for good cause shown. *See McGrady v. D'Andrea Electric, Inc.*, 434 F.2d 1000 (5th Cir.1970).

■ It is clear that default judgments should not be entered because of technical errors. *McKenzie v. Wakulla County*, 89 F.R.D. 444 (N.D.Fla.1981). But when a defendant's actions or inactions amount to willful misconduct, gross neglect, or other extreme and unusual behavior, a default judgment is appropriate and even necessary to ensure the functioning of the judicial process. A defendant cannot be permitted to "avoid or delay a plaintiff's right to judicial resolution of a dispute by ignoring the proceeding." *Id.* [5]

---

**4.** Kahn was well aware of Callier's efforts to serve Roggio. On July 7, 1980, this Court found that service had not been effected on Roggio and ordered Callier to obtain service by July 24, 1980 or show cause why the action should not be dismissed. On July 18, 1980, Callier filed a motion for an extension of time within which to effect service. Callier stated that it had attempted to serve Roggio through the office of the United States Marshal but was unable to do so. Callier thus asked the Court to appoint Ron Marone to serve process on Roggio. On July 21, 1980, the Court granted Callier's motion to appoint process server. In addition, on August 19, 1980, in this Court's absence, Judge James W. Kehoe issued an Order Appointing Process Server, in which the Jacksonville firm employing Mrs. Rivers was hired to serve Roggio in Florida. All of these pleadings and orders were served upon Kahn, who now claims that he never told Roggio about the pleadings. This Court chooses to doubt Kahn's credibility, especially in light of the fact that Kahn's bills include time entries for his "review of Motion and Memorandum of Law for Leave to Join Vincent Roggio and Birchminster, Industries as parties," and his "Receipt and review of Order of Court allowing Amendment to Third Party Complaint." Kahn's bills also indicate that he spoke to Roggio on the telephone after receiving these documents.

**5.** According to C. Wright, A. Miller & C. Kane, *Federal Practice and Procedure* § 2693 (1983):

[W]hen the party in default engages in delaying or obstructing tactics or wilfully ignores the processes of the court, a district judge generally will be reluctant to grant a motion to set aside the entry of judgment or will do so only on terms that will alleviate any inequities caused by the defaulter's behavior. These cases indicate that the good or bad faith of the parties may be one of the most important factors in deciding motions under Rule 55(c). *Id.* at 488–89 (footnotes omitted).

■ Thus, this Court has broad discretion in determining whether to vacate or uphold a default judgment. In exercising its discretion, this Court chooses to uphold the June 7, 1982 default judgment. This Court finds that Callier acted in good faith and "has diligently pursued service on a nomadic defendant ... who has created confusion and secreted his whereabouts." Transcript at 15. No good cause has been shown for setting aside the default.

### III

The evidence at trial has demonstrated that Callier, in good faith, attempted to serve Roggio through several methods of service, which were approved by this Court and the court of common pleas in Philadelphia, Pennsylvania. Roggio was on notice that a law suit was pending against him and that service was being attempted. Still, Roggio avoided process in various ways, including never staying in one location for more than a day or two, and instructing his employees to give varying and conflicting stories about his residence and location.

■ Roggio, and Roggio's agents, have demonstrated a cavalier disregard for the judicial process and may be guilty of a fraud upon this Court. Based on these findings, and for two independently sufficient reasons, this Court has personal jurisdiction over Roggio and the default judgment should not be vacated. First, Roggio was bound by the personal service effected upon his Birchminster receptionist and the substituted service effected on his cousin Vincent D. Roggio. Second, Roggio, through the gross negligence and/or actual fraud of his agents, has waived any right he might have had to complain about technical defects in the service upon him.

*This Court has personal jurisdiction over Roggio:*

Both Florida and federal courts have held that actual notice of a complaint, coupled with good faith attempted service, may be sufficient to confer personal juris-

diction, especially when a defendant has acted to evade service of process.

Fed.R.Civ.P. 4(d)(1) provides that service of process shall be made:

[u]pon an individual other than an infant or an incompetent person, by delivering a copy of the summons and of the complaint to him personally or by leaving copies thereof at his dwelling house or usual place of abode with some person of suitable age and discretion then residing therein or by delivering a copy of the summons and of the complaint to an agent authorized by appointment or by law to receive service of process.

Courts have liberally construed Rule 4(d)(1) and found valid service of process when a defendant has actual notice of a lawsuit filed against him. *See Nowell v. Nowell*, 384 F.2d 951 (5th Cir.1967), *cert. denied*, 390 U.S. 956, 88 S.Ct. 1053, 19 L.Ed.2d 1150 (1968) (when defendant had actual notice of lawsuit, service of process left with defendant's apartment complex manager who resided in a different building than the defendant was effective); *Karlsson v. Rabinowitz*, 318 F.2d 666 (4th Cir.1963) (service of process left at defendant's former residence was effective because defendant had actual knowledge of the suit). In such situations, notice of the pending lawsuit satisfies the due process of law requirement that a defendant receive fair notice of a proceeding against him and thus provides the court with in personam jurisdiction.

To determine if service of process has been effective, courts necessarily examine the facts of each particular case. If the court finds that the defendant received notice of the complaint and the plaintiff made a good faith effort to serve the defendant pursuant to the Rule, then the court will most likely find that service of process has been effective.

Effective service is most likely found when a defendant has engaged in deception to avoid service of process. For example, in *Blackhawk Heating & Plumbing Co. v. Turner*, 50 F.R.D. 144 (D.Ariz.1970), the district court held that process left with the

defendant's daughter at his former residence was effective despite the fact that he had moved. The defendant had actual knowledge of the complaint filed against him, like Roggio, but still attempted to evade service of process by making it appear that he still lived at his former residence.

In a similar case, the Fifth Circuit recognized that, in certain situations, strict compliance with Fed.R.Civ.P. 4(d)(1) is unnecessary. In *National Labor Relations Board v. Clark*, 468 F.2d 459 (5th Cir.1972), the owner of a nursing home entered into a secret lease agreement with the supervisor of the home, giving the supervisor control of the nursing home. Subsequent to this arrangement, the National Labor Relations Board attempted service on the owner at the nursing home. The owner argued that service was improper because, by virtue of the lease agreement, the nursing home was no longer his principal place of business. The court rejected this argument, finding that "would-be process servers are not entirely at the mercy of elusive defendants," and "[a] defendant who beclouds his whereabouts should not be entitled to benefit from the process server's consequent confusion." *Id.* at 464.

Several state courts have adopted similar approaches in upholding service of process when a defendant deliberately and unfairly evades service. The Florida authority is *Luckey v. Smathers & Thompson*, 343 So.2d 53 (Fla. 3d Dist.Ct.App.1977). In *Luckey*, the defendant had "for the purpose of avoiding all legal matters, secreted himself from the world and lived in isolation in a high security apartment refusing to answer the telephone or even to open his mail." *Id.* at 54. Service of process, naturally, could not be effected. Nonetheless, the court affirmed the trial court's decision denying defendant's motion

to vacate the writ of execution and levy of sale. The third district recognized that "there is no rule of law which requires that the officers of the court be able to breach the self-imposed isolation in order to inform the defendant that a suit is filed against him." *Id.*

The facts in this case clearly parallel those in *Blackhawk*, *Clark* and *Luckey*. This Court has found that Roggio, individually and through his agents, wilfully attempted to evade service of process. The evidence at trial has demonstrated that Roggio confused and tricked Callier concerning his location. First, the Birchminster receptionist received a summons and complaint on Roggio's behalf and delivered it to Neil Peterson, general counsel for Birchminster. Peterson now claims he never discussed the complaint with Roggio (chairman of the board and principal shareholder of Birchminster). Second, Roggio's first cousin, a law student, received court authorized service of process but never responded to the process and complaint because, by his own admission, he "didn't want to hurt [his] cousin." The cousin, Vincent D. Roggio, did tell Roggio's agent and liason, Charles Ascenzi, about the service. Thus, Callier was duped into believing that substituted service had been effected.

Finally, Roggio's housekeeper at what Roggio now claims is his Reddick, Florida "residence," was instructed to and did tell Callier's process server that Roggio had moved from the house several months prior and that the house was up for sale.

Roggio's in house counsel, Peterson, knew of the efforts to serve Roggio and helped Roggio avoid service. Roggio's Florida attorney, David Kahn, actively participated in the instant litigation and was well aware of Callier's efforts to serve Roggio.[6] Nonetheless, Roggio and Kahn

---

**6.** Roggio is clearly held to have notice of the pleadings served on, and the facts revealed to, his attorney David Kahn. *See Link v. Wabash Railroad Co.*, 370 U.S. 626, 633–34, 82 S.Ct. 1386, 1390–91, 8 L.Ed.2d 734 (1962).

[The defendant] voluntarily chose this attorney as his representative in the action, and he

cannot now avoid the consequences of the acts or omissions of this freely selected agent. Any other notion would be wholly inconsistent with our system of representative litigation, in which each party is deemed bound by the acts of his lawyer-agent and is considered to have 'notice of all facts, notice of which can

waited until after the final default judgment was entered (nearly three years from service on Roggio's cousin) before moving to dismiss for defective service of process.

This Court finds that during the period Callier was attempting to serve Roggio, Roggio had no "usual place of abode" as defined in Fed.R.Civ.P. 4(d)(1). Roggio admitted that during the period of time Callier attempted to serve him, he travelled from city to city. Roggio testified: "I never stay any place too long. If I stay somplace three days I've been there very long." Deposition of Roggio at 16; Transcript at 120. Service on the receptionist in Roggio's Birchminster office is as close to service on an adult at Roggio's "abode" as anyone could reasonably hope to achieve under the unique circumstances of this case. Additionally, Roggio was properly served through service on his cousin, Vincent D. Róggio. Both of these service efforts constitute effective service in view of Roggio's knowledge of the action, his travel schedule, the veil of secrecy with which he shrouded his whereabouts and the fraud and/or gross neglect of his agents. The default and final default judgment must be upheld.

*Roggio waived his technical objections to the service.*

 Roggio, in his trial brief, complains of Callier's "feeble efforts" to serve him and suggests that "everything Callier did was either insufficient or legally wrong." Trial Brief of Vincent Roggio at 4. Roggio's argument merits brief consideration. This Court is of the opinion that Roggio has waived his right to object to any technical defects in the service of process.

As early as 1936, the Florida Supreme Court recognized that a defendant must move diligently to quash allegedly defective service of process:

> A distinction is to be noted between a total want of service where the defendant received no notice at all, and a service which is irregular or defective but

actually gives the defendant notice of the proceedings against him. The former confers no jurisdiction of the person by the court, but the latter or defective service of process, on the contrary, confers jurisdiction upon the court so that the person summoned as that the judgment based upon it is voidable only and not void.... In order that a person complaining of the defective service may avoid the consequences of a judgment based thereon, he is required to move diligently by either plea in abatement to the jurisdiction or motion to dismiss. In the case where there is defective service only and the party fails by appropriate proceedings to quash the service or dismiss the writ, prohibition will not lie upon the ground of the insufficiency of the service.

*State ex rel. Gore v. Chillingworth,* 126 Fla. 649, 651, 171 So. 649, 652 (1936) (en banc) (citation omitted). *Accord Schwarz v. Thomas,* 222 F.2d 305 (D.C.Cir.1955); C. Wright, A. Miller & C. Kane, *Federal Practice and Procedure* § 2695 (1983).

In this case, Roggio did not "move diligently" to complain of any of the defects in the service of process on him. Despite the knowledge of his Florida attorney of efforts to serve Roggio, the knowledge of his Birchminster lawyer of the amended third party complaint left with the receptionist, the knowledge of his cousin mistakenly served with the complaint, and the knowledge of his "liason man," Charles Ascenzi, of Callier's service attempts, Roggio did nothing. He waited over two years, until Callier entered into a consent settlement with Keevan, to attempt to set aside the default judgment.

This attempt, however, must fail. Roggio has waived any objection he now raises to the service of process. Were this Court to rule otherwise, it would provide defendants with an incentive to avoid service of process by tricking process servers and lulling the opposing party into a good faith

be charged upon the attorney.' *Smith v. Ayer,* 101 U.S. [(11 Otto 320)] 320, 326 [25 L.Ed. 955 (1879)].

belief that service has been made. Then, years after the default was entered, and the lawsuit litigated, the erstwhile defendant could emerge, as Roggio now has, in an attempt to set aside the default. Granting Roggio the relief he seeks would be unjust, wasteful and contrary to the law. His motions to set aside the default and final default judgment are denied.